Good afternoon, your honors. I want to thank you for the opportunity to be here as the first, and it's truly an honor and a privilege. My name is Brian Langford, and I represent the plaintiff in this matter. The plaintiff's name is Missy Dawn Carvell. We represent her estate through her mother, Gretta Lane Carvell. This matter stems from the unfortunate suicide death of Miss Carvell on October 2, 2019, while she was a pretrial detainee at the Acadia Parish Correctional Center located in Crowley, Louisiana. After reviewing the briefs, I'm not too sure that there is a dispute as to the legal standards in this case. Well, I mean, so that's a – I thought that at some point you were relying on the district court's opinion in Edmiston. Yes, that was. Now, I guess the reality is in August we reversed that. That's correct, your honor. I would respectfully suggest that the Edmiston case is a bit different from this case. Well, okay. It is a standard. Yes, your honor. In that particular case, as the court is well aware, this court was limited to the four corners of the pleading because that came up on a motion to dismiss. The irony is that the complaint in this particular case, in a post-Edmiston world, I don't know if it passes the test. But in Edmiston, we had a limited record. In this particular case, being that it's on a summary judgment, we do have a record. Okay. Well, why don't you explain to me because I've read Edmiston recently, and I know what was alleged in that case. Why don't you tell me how the summary judgment record in your case takes it outside? In this particular case, yes, your honor. In this particular case, it strictly goes down to knowledge. Before even getting into policy or whether that was a moving force behind a constitutional violation, it goes down to the knowledge. Because the only way that we can establish that there was a constitutional violation on behalf of the defendants is whether or not they had the requisite knowledge. Knowledge of the specific risk of suicide. Exactly. Yes, your honor. In this particular case, as the court is well aware, the plaintiff was transported from the local hospital on the date of her arrest to the jail. We know that there was a discharge summary issued by the attending physician. He gave her flying colors saying that she's okay. These are, quote, pseudo seizures. Now, what we also know is that the attending physician pulled, like any physician would, pulled her ED clinical summary. She had been a repeat patient at this particular hospital. And in February of 2019, there was one attempt on her life. She attempted to take her own life by consuming a number of pills and whatnot due to a dispute with her boyfriend. In addition to that ED clinical summary, your honors, it states major problems, major active problems, bipolar, major depression, and suicidal ideation. Okay, so suicidal ideation, where is that? In February 7th of 2019, that was provided in our response to the defendant's original measure. Right, right. But how does your saying the record shows that the jailers were subjectively aware of that? We don't know that. That is why we believe that that is an issue that should be. I pulled up the entry record. I was pleased to see it. We see a fair number of these cases. It was what their intake form was. Yes, sir. And this person answered, what, seven, 13 questions. And she said, you had medical problems? Yes. Are you prescribed medications? Yes. Do you use alcohol or street drugs? Yes. Was it a force of duress? No. Have you, et cetera. It goes right through the whole series of those. At any time, did you lose unconsciousness? This is the entry form. No. General appearance? Indicating it goes through tremulous anxiety, coughing, a whole list of things. It goes through seven different categories. Yes, sir. So what we have then is an intake form. Yes, sir. Which is now becoming, we wouldn't always have those in these cases. Yes, sir. But that's the information that came in at the time. So you start with that was a base. Now, to me, I don't see much of a warning in that particular formulation. These are her answers. Yes, sir. May I respond to that? Yes. That was an issue that was a fact that was not addressed in the brief, which was prepared by my partner. And I noticed this, that intake form has three separate longs, three separate sections for answers, three questions for the inmate, questions for the transporting officer, and questions for the intake officer. All law enforcement officials, as Judge Higginbotham noted, none of them clicked yes for any signs of suicidal ideation, withdrawal, etc. But question number one to Ms. Carville is, I believe, are there any medical conditions that the jail should be made aware of? She selected yes, in addition to selecting yes that she uses street drugs. The issue that we have with that is we don't know, through the documents that have been furnished and that are in the record, furnished through the Acadia Parish Sheriff's Department, we don't know what she said to that intake officer. There is no record. We don't know if she mentioned that I have a history of suicidal ideation. We don't know if she said she had a peanut allergy. The lack of that information in and of itself calls into question just not only the policy. After she's arrested for shoplifting, the hospital clears her for incarceration. That is correct, Your Honor. And the intake says not exhibiting danger or risk of suicidal behavior. That is correct, from the intake officer. So far, there's nothing to suggest deliberate indifference to a known risk. That is true. And she gets seen on the 30th by a doctor who says her mental status is appropriate. And then on October 1, the day before the death, Guidry sees her. Correct? Yes. The day before. My question is, can you point to any affirmative signal? She's not on suicide watch. She doesn't say she's suicidal. Right? None of those. What's the warning signal that made them deliberately aware? I think that that is the big concern here, the fact that she responded to a question about a known medical condition that she felt that the jail should know about, and we don't know what it was. There's nothing in the record pointing to that, Your Honor. And I think that is one of the big red flags. In addition, Your Honor, we also know, and not through the record or the documents provided by the United States Appearance Service, or we know it through the own admissions, and Judge Durell even pointed out in his ruling that in support, let me rephrase this, they mentioned that they did everything that they could. She saw various medical personnel. She saw Deputy Guidry, and specifically she saw an outside physician, Dr. Dawson, on the date that she died. And they pointed to that. So you're confirming that fact. I thought that was, but the record was unclear. She saw Dawson on the day she committed suicide. That is correct, Your Honor, earlier that day. How does that help your case? It helps my case. It is our position, respectfully, Your Honor, because that tells me, and the defendants clearly stated, that pursuant to the attending physician's discharge instructions, she should follow up with a physician within one to two days if the pseudo seizures continue, which they did, and they admit that they did. So the question is, Your Honor, and let me just point this out, Your Honor, there is no record that they actually had the discharge instructions. This is on summary judgment? So discovery has occurred in this case? Discovery has occurred. Okay. Now whose burden is it to show a fact issue as to knowledge of risk of suicide? Well, this would be our burden. When you say there's a lack of evidence, then I don't see how that helps. Well, I believe in line with the Farmer case, I believe that requisite knowledge is a legal fact. It's a legal question that can be resolved through all sorts of avenues of evidence, including inferences from circumstantial evidence. And I believe that given these holes in the record, in the documents. Well, let me go back to the documents again then. Yes, sir. These are the notations that are made by the receiving deputy, not by the person under arrest itself. And there's a whole series here of no's. I won't go through them all. But one of them is, number three, is the arrestee displaying destructive, insensible, or disorderly behavior? Does the arrestee have any obvious mental problems? Does the arrestee's behavior indicate the danger or risk of suicidal behavior? No. It goes on through skin appearance, ease of movement, et cetera. Any bleeding, injuries, pain, medical needs or difficulties? No. And so forth. So at least at that juncture, that's part of the record evidence. Yes, sir. How do you respond to that? Again, Your Honor, I believe that there are holes, that these are issues that I think that a reasonable jury would say, why is this here but this isn't here? And I think that those are issues to be determined by the jury. I wholeheartedly believe. Why don't you ask the jury? I would ask. Well, what's the Rule 49 submission to the jury? Do you find for a part of the evidence that? I think that we would find that. We would find that they knew about it or that they had subjective knowledge. That's what we would obviously argue. You kind of caught me on the spot there. I apologize. But I just believe that in this particular case, that there are so many holes on the record, on the documents provided by the P.K. Parrish Sheriff's Department. And just like Judge Higginbotham pointed out, that one question, do you suffer from any medical conditions that the jail should be made aware of? And it just says yes. There is no other additional paperwork furnished by the jail. We don't know if that goes in a file. We don't know. There is literally nothing there to tell us. And moreover, I do want to point out, Deputy Guidry, who was the medical officer, he indicated that he put her in the lockdown cell the day before her death because she, and he stated this in his incident report, because she had a history of pseudo seizures or faking seizures. How does he know that? Is it in her file? We don't know. I thought she did it to get the phone call. She did. But he specifically stated in his incident report that she had a history of faking seizures. Now, he may have known that because she may have been a frequent flyer in the jail. That's possible. But we don't know that. We don't know what was in that file. And the whole K.D. Parrish Sheriff's Department has that one policy that's in the record stating that everybody from the deputy down to the medical officers down to the low-level employees needs to familiarize themselves with medical files of inmates. Why do they have that? But the warden said he looked at the files and there was no indication anywhere in the jail files that this young woman was suicidal. My response to that, Your Honor, is that the warden... I don't have that. I have an affidavit. I don't have that. You're disagreeing with the existing records saying you'd like to find more. Absolutely. Okay. Yes, sir. That sounds good. You're welcome to continue and you will have rebuttal time. Okay. Any other points you want to highlight? I'll lay low for now, Your Honor. Okay. Thank you. Thank you, Your Honor. Mr. Richardson. Good afternoon, Your Honors. A couple of points. Judge Duncan had asked about Edmondson and I do believe that was the basis of the appeal when I first read the brief. They were citing the Edmondson case. But as we know, Edmondson has been overturned by this court. And specifically to Edmondson, it was a suicide case. The court found no deliberate indifference on an officer who didn't bring an inmate to a mental facility when the individual when arrested says, they're trying to kill me. And that was repeated again when he was going to his cell and citing this court. This court said Schubert, while escorted to his cell, reiterated to the deputy that someone was trying to kill him. Again, plaintiff's assertions do not plausibly allege that the deputy had actual knowledge that Schubert posed a substantial risk of suicide. So, as we've indicated before, the important point here is we have to show that not only did the jail staff and defendants, in this case, know that there was going to be a suicide, but chose not to do anything and were deliberately indifferent to the fundamental constitutional rights. Well, if he did know, putting her in a room with loose bedsheets would probably qualify did in converse, correct? If they did know, but that's... Oh, it's not so much... Clearly, Guidry did not abate a problem. If he knew of one, putting her in a room with bedsheets... Sure, if he knows someone's... So the issue does come down to what did Guidry really know on the first, right? Absolutely. That is the question. And the question, and to the point, Jace Higginbotham, and I think, Judge Higginson, you as well, have pointed out the facts here, that she does go to the hospital, and remember, it's not Acadia Parish who's arresting her. It's the Crawley Police Department. But when the Crawley Police Department brought her into the hospital, they specifically asked, and I'm looking at the record, the doctors there, they say the police department's on record 309. Police department requesting us to clear patient for incarceration. So before they come to my clients, the police department is asking the medical department, hey, look, we're going to bring this lady into... The hospital did note suicidal ideation. Not from this visit. And there's a past situation. If you look under page 310 in the record, past medical family social history, and what my counterpart has indicated here is correct, I think in February or something, you know, eight months before. But what's important, and that was addressed in the trial court, is what was happening on this visit. There's nothing, and Judge Durell indicated this in his ruling. Just to jump to what seems the most concerning is the medic that looks at her the day before does perceive that she's even faking seizures. In some ways, that's worse. Someone is faking that they're going to hurt themselves. You wouldn't be suicidal if you're just having epileptic seizures. But if the medic knows she's pretending to self-harm... Well, I think that was figured out, right? So she was doing these pseudo seizures, but the reason is that he went in there. He brought her into the office. Well, I think it's been pointed out elsewhere that pseudo seizures are not fake symbols. That's a medical term for a particular phenomenon that it is not an individual that is faking something. It is rather descriptive of a physical reaction that they're having. So that's... No, I understand. Well, there's a real difference, a relevant difference here. Sure, and two things to that point. One, they did bear that out. They brought her in, and she did indicate, I'm doing this because I want to use the phone. And they did let her use the phone. But to your point, Judge, they went further, though. They did have a doctor, outside doctor. Remember, there's a first doctor, then there's two EMTs from the jail. Then after this, they'll go above and beyond. They get an outside doctor to come in, and he also doesn't find any kind of suicidal indications or ideologies or anything. That was on October 2nd. That was on October 2nd. Did you notice the record reflecting that visit was dated on the 30th? Yeah, I see that. Yeah, I looked at that last night. So you have to read that in conjunction. So that's on page 130 is what you're talking about, that exam record. And then if you look at the next page, which is 131, that's the narrative of the EMT group, and they explain what goes on. He agrees with it anyway. So you're saying a doctor was there the very day that she kills herself. Right, and it's on the bottom. It's just on the same form. That clears it up. Thank you. Also, too, Judge Duncan, to your point, in terms of discovery, I know that plaintiffs are arguing, hey, we want more. We think this might be this. We think there might have been something different. It is the plaintiff's burden to show that there was some type of deliberate indifference that occurred. And to this point, there is nothing. And just to make the record complete, there was multiple opportunity for the plaintiffs to do any kind of discovery they wanted in this case. A trial was originally set for June 6th of 2022, with discovery being closed on December 27th of 21. A request was made for additional time that was granted. Discovery was again set to 5-16-22. Then another extension was granted, and then the judge said, I'll give you another one, to August 15th, 2022. Went through all that, and then in October, we filed a motion for summary judgment. When you look at the facts of this case, though, whether it's individual capacity claims or official capacity claims, you still have to show deliberate indifference, right? So for an individual capacity claim, you must show that those individuals actively participated in it or they were the moving force behind it, that they were the policymaker. And for official capacity claims, you have to show there was a policy or a custom that was deliberate indifference. None of that applies in this case because there is no – that would have made anybody in the jail aware that this individual was going to commit suicide on that day at that time, particularly under those four different visits from a doctor. And there's this case – this court has recently determined that contemporaneously, you know, contemporaneous issues matter, right? She was brought in on one day, and then five days later, we have the situation. But during that five days, they didn't ignore her. She was seen multiple times, and she was cleared by four medical professionals, two of which were outside independent doctors. Under those facts, it just can't be said that there was deliberate indifference by any of the defendants in this matter. Okay. Thank you, Your Honors. Thank you, Counsel. Mr. Lankford, do you want to make some points? Yes, Your Honors. Just a few. One thing in particular, Your Honors, the discussion as to pseudo seizures and somebody who might be exhibiting pseudo seizures, especially on a consistent basis, might not just be faking it. There might be some other underlying cause. The defendant's experts report states in the ED clinical summary from 9-27-2019 generated at the Acadian General Hospital states that her diagnosis in this visit, medical problems, minor drugs, noncompliance with her phenobarbiturals, which are her anti-seizure drugs, apparently, and pseudo seizures. And it says specifically, and their expert points it out, which are fictitious displays from patient. However, occasionally, they may be psychotic in origin or may be manifestations of some other disease. We know she saw all these medical professionals and there were no other underlying problems. So one has to ask, why is this woman, why are we continuously doing these seizures? Why are we doing this? That raises an issue. I think that does. Secondly, Your Honor, there was a date, a discrepancy in a date that was pointed out. We look back, Judge Higginbotham, we look back to the intake acceptance form. There's a, before they sign, there were three boxes, accepted, not accepted, accepted with AGH clearance, Acadiana General Hospital clearance. That's not selected in this. It just says accepted. Moreover, it's dated 11-28-2019, when our plaintiff died on October 2nd of 2019. There are serious discrepancies here in the record keeping of the Acadia Parish Correctional Center and what's in this record today. And I think that it is our position we respectfully submit that they should be, they should be punted to a jury and make that determination. Okay, Counsel. Thank you very much. Thank you, Your Honors. It's been a pleasure. Thank you. Thank you very much. And that concludes.